THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* MINOT F. JELKE, Also Known as MICKEY JELKE, Appellant.

First Department, May 18, 1954.

*George W. Herz* of counsel (*Arthur R. Stelljes* with him on the brief), for appellant.

*Richard G. Denzer* of counsel (*Warren S. Tenney* with him on the brief; *Frank S. Hogan, District Attorney*), for respondent.

BASTOW, J. The defendant has been convicted by the verdict of a jury of two crimes of compulsory prostitution in violation of section 2460 of the Penal Law. The indictment contained nine counts. Six of these were in substance dismissed by the court at the close of the evidence and the jury acquitted as to one of the three counts submitted.

An examination of the record disclosed sufficient evidence to sustain the verdict of the jury. We reach the conclusion, however, that the happening of certain events during the trial were prejudicial to the defendant in that they deprived him of a fair and impartial trial. Whatever opinion we may entertain as to

the guilt of the defendant, the judgment of conviction may not stand when the conclusion is reached that the fundamentals of a fair trial were not respected.

We discuss at the outset two incidents relating to communication with and interrogation of jurors by the Trial Judge after the jury had been selected and the trial was in progress. The first of these incidents took place on the seventh day of the trial. When recess was taken at the end of the day the jurors were excused, except juror number 5 who was summoned to the bench with counsel for the respective parties. The court — apparently not in the presence of the juror — read into the record an anonymous letter he had received. It read: '' [Juror number 5] was the owner or agent for the apartment house at 305 West 111th Street, Manhattan. During 1940, numerous dispossess orders were served against a group of prostitutes who resided on the first floor, and numerous arrests were also made by the police department in this house. I was informed that the records of the Court on West 155th Street showed that it was evident that [juror number 5] would cause dispossess notices to be served after each arrest, then accept rent and thus continue the same tenants in possession of the apartment.''

Defense counsel strenuously objected to any interrogation of the juror but the court proceeded to do so after enunciating his rule of procedure that '' If I find that any juror isn't impartial, I will take him out of that box any time I can.'' Neither the contents of the letter nor the substance thereof was correctly communicated to the juror. He was told by the court that '' we have a letter here which indicates — I might say it is an anonymous letter — that at sometime or other while you were managing certain property at 305 West 111th Street you had some trouble with tenants there who were prostitutes.'' The juror stated that '' Liability notices '' had been served upon tenants for gambling but denied the service of any for prostitution. The court thereupon enlarged its inquiry as to the impartiality of the juror '' as the result of any experience you have had in these instances of gambling ''. Upon receiving a reassuring reply from the juror, the court inquired if the juror took '' any exception to my asking you these questions '' or whether he had '' any prejudice now because I have asked you these questions ''. The juror not unexpectedly answered in the negative to both questions.

We pass without further comment at this time to the second episode. At the beginning of the **afternoon** session of the eighth

day of the trial the jurors, except juror number 11, were asked to step into the jury room. At this time Sandra Wisotsky, also known as Pat Ward, was testifying as a witness for the People for the third consecutive day. Juror number 11 was summoned to the bench and the following occurred:

" The Court: This witness [Pat Ward] has indicated to me, or rather to Mr. Liebler [Assistant District Attorney], that she thinks she knows this man.

" The Juror: I would not know her.

" The Court: I have to ask these questions.

" The Juror: It is amazing.

" The Court: It is a situation that I have to ask these questions. You say you do not know her?

" The Juror: No, sir.

" The Court: All right."

This was only the beginning of this unusual episode which was not concluded until two weeks later and just before the court delivered its charge when a final determination was made by the court and the juror that the latter could be impartial and unbiased.

The original charge that Pat Ward thought she knew the juror was leveled at the latter on a Friday. At the opening of court on the following Monday in the absence of the jury, except juror number 11, the following took place:

" The Court: [Juror number 11] was in to see me this morning and he informed me that over the week-end he became all upset about this incident in which the witness, Pat Ward, indicated that [she] might know him. He called first Mannie Robbins, who is a life-long friend of his, and told him what had happened.

" [Juror number 11]: We did not discuss the case.

" The Court: He did not discuss it but he sought Mr. Robbins' advice. Mr. Robbins, as I understand it, told him that that was a question which he had to resolve himself, namely, whether he could be a fair and impartial juror; and that was the question addressed to Mr. Robbins. Then he called his own attorney, who is —

" [Juror number 11]: Harold Berkowitz.

" The Court: — Harold Berkowitz, and told him that he didn't know whether he could be a fair and impartial juror and asked his advice also. Mr. Berkowitz told him that he would have to resolve it himself.

" Then [juror number 11] came in to me this morning and said the same thing, and I gave him the same answer, that that is something he will have to resolve himself, *and the statement was made to me that he felt maybe there might have been some motive for this girl saying that she thought she knew him.* Subject to your approval, counsel on both sides, it was my suggestion to [juror number 11] that if it met with your approval he should stay on there and after the passage of two or three or four more days, if he still has the same feeling, that he come back and acquaint us with it; or if he doesn't, at some stage of the proceedings we will pick him up again and ask him about it and possibly he may be able to resolve this question in his own way. I think we will all be able to rely on his statement as to whether or not he will be able to be a fair and impartial juror. How does that strike you?

" Mr. Segal: The same as it strikes you.

" Mr. Liebler: It is satisfactory to me.

" The Court: Is that all right with you?

" [Juror number 11]: *I certainly feel a lot better after the chat with you.*

" The Court: We leave it to your judgment. You don't have to come forward until sometime before I give this case to the jury —

" [Juror number 11]: I will certainly give you an honest answer.

" The Court: — and I will take it up with the lawyers.

" [Juror number 11]: Thank you very much.

" The Court: Bring in the jury." (Emphasis supplied.)

There the matter rested for two full weeks. It is clear that after the juror's discussions with his friend and his attorney and his " chat " in the Judge's chambers the juror did not know whether he could be fair and impartial. The court had thus become deeply involved in a proceeding that never should have been commenced. At this stage most certainly some final decision should have been made. The juror had told the Trial Judge that he (the juror) " felt maybe there might have been some motive for this girl saying that she thought she knew " the juror. One searches the record in vain for any inkling as to such a motive and while Pat Ward was a witness for the People, the juror may have ascribed her motive to her character deterioration for which the People claimed the defendant was responsible. In any event the proceeding should have been promptly

resolved by an insistence that the juror decide whether he could or could not be a fair juror. Instead, the juror was not even asked to make a decision. He was given the choice of two alternatives. First, that " he should stay on there and after the passage of two or three or four more days, if he still has the same feeling, that he come back and acquaint us with it ''. Second, " if he doesn't, at some stage of the proceedings we will pick him up again and ask him about it and possibly he may be able to resolve this question in his own way.''

Thus, the Trial Judge completely abdicated to the juror the court's authority to make a determination of the qualification of the juror to sit. The latter returned to the jury box in a stated frame of mind that he did not know whether or not he could be fair and impartial. This action was taken in the face of the court's previous statement when dealing with the other juror, who was suspected of having prostitutes as tenants, that " If I find that any juror isn't impartial, I will take him out of that box any time I can.''

Finally, as heretofore indicated, after the summations had been completed and the court was ready to deliver its charge, juror number 11 was summoned to the bench and the following took place:

" The Court: Now, we had some discussion with you, it must be over a week ago.

" The Juror: Yes, sir. Two weeks.

" The Court: It was concerning the statement of Pat Ward that she thought she might know you.

" The Juror: Yes.

" The Court: At that time you were uncertain whether it was going to prejudice you one way or the other, either against her, or not permit you to be a fair and imparital juror. At that time we left it with the understanding that you were to tell me later in the course of the trial if you felt that you could not be a fair and impartial juror. You haven't told me, so I assume your answer is you could be a fair and impartial juror?

" The Juror: Absolutely, your Honor.

" The Court: That you are not going to be prejudiced by the statement that she made.

" The Juror: I am quite sure of it.

" The Court: To the extent that you would be unfair and not impartial.

" The Juror: Absolutely. As a matter of fact, your Honor ——

" The Court: No, no, don't say any more than that.

" The Juror: All right."

The purpose of the *voir dire* examination of prospective jurors is to permit the court and respective counsel to inquire as to the qualifications of the talesman to serve in a particular action. In a criminal case a juror may be challenged for cause, which is an objection that a particular juror is either disqualified from serving in any case, or that he is disqualified from serving in the case on trial (Code Crim. Pro., § 374). Furthermore, the court may, in its discretion, for good cause set aside a juror at any time before evidence is given in an action (Code Crim. Pro., § 371).

There is good reason for these precise and definite rules of procedure. Trial by jury in a criminal case is firmly embedded in our form of government. In general when a jury is accepted and sworn and the giving of testimony has commenced further investigation and questioning of a juror as to his qualifications based upon matters preceding his acceptance as a juror have no place in our form of procedure. It is recognized that after a jury is impaneled it is under the control of the court and any misconduct should be immediately corrected and, if necessary, punished by the court in the exercise of its plenary powers or by criminal prosecution.

Here we have two separate and distinct investigations by the trial court of different jurors on successive days relating to their qualifications to serve impartially. There was no showing that either juror had concealed any facts or made any untruthful statements upon his *voir dire* examination. There was no evidence of any improper conduct on the part of either juror after he had been accepted and sworn as a juror in the case. To place the stamp of approval upon what took place is to enunciate a rule that a criminal trial may be interrupted at the pleasure of the court while explorations are made as to matters that should have been developed upon *voir dire* examination or left for proper disciplinary procedure at the close of the trial.

It is idle to speculate as to what psychological effect these activities might have had upon the two jurors. Certainly the other ten members of the jury knew that from time to time individual jurors were being retained in court after they had departed. Juror number 5 was left with the definite impression that he was suspected of having had business dealings with prostitutes. The other juror was permitted to sit in the jury box for the last two weeks of the trial and during some portion thereof

he did not know as to his ability to be impartial. At some time during this period he appears to have reached the conclusion he could be a fair juror.

In *People ex rel. Flaherty* v. *Neilson* (22 Hun 1, 5) the Trial Judge interrogated a juror in his chambers during the course of the trial in regard to an anonymous letter the Judge had received. In the letter it was charged that the juror had been playing cards with the sons of one of the defendants before the trial commenced. In reversing the judgment of conviction for what the court described as improper interference with the jurors it was said that "The tendency was to dominate the juror's free will and to terrify him into a verdict for the people."

We also regard as improper the private conversation between the Trial Judge and the juror who had doubts as to his ability to be an impartial juror. *People* v. *O'Keefe* (281 App. Div. 409, affd. 306 N. Y. 619) is distinguishable from the instant case. There the private conference between Judge and juror took place before the completion of selecting the jury. The attorneys for the defendants were advised of what had taken place and were given the opportunity to consent that the juror be excused. They declined to do so although the Judge offered to add an additional peremptory challenge to the number of challenges then remaining if they agreed to excuse the juror. It was held that a subsequent reservation of rights until the close of the trial by the defendants concerning the qualifications of the juror did not preserve the objection for use at a later stage. There the appellate court was passing upon questions relating to the organization of the jury. In passing, however, the court reaffirmed the recognized rule that a trial judge ought not to communicate with any juror or prospective juror in the absence of counsel for all parties.

We view as serious error the action taken by the trial court relating to the two jurors. We are not called upon, however, to decide whether standing alone reversible error was committed. There was other and more serious error that demands a new trial.

We refer to the action of the trial court in closing the trial to both public and press during the presentation of the People's case and conducting a public trial during the presentation of the defense. To view the matter in proper perspective it is necessary to outline the series of events that led to the final decision of the court.

The selection of the jury occupied the first three days of the trial. On the fourth day of trial respective counsel gave their opening statements to the jury. The prosecutor in his statement outlined in some detail the activities of Pat Ward, the principal witness for the prosecution. No attempt was made to conceal any of the events of her sexual life and when the opening was concluded a picture had been painted of Pat Ward as a common prostitute. It is perhaps not amiss to point out that in his opening the prosecutor stated that it was " with regret that I am forced to bring out the names of men " with whom Pat Ward had consorted for money.

During all of the proceedings up to this point the trial had been open to the public. As the taking of testimony was about to commence an attorney representing Miss Ward made oral application for an order to exclude the public and to conduct the trial behind closed doors during the period that his client was testifying. Curiously, he then stated as the grounds for his application the facts relating to Miss Ward's sex adventures that the prosecutor had just stated in much greater detail in a courtroom open to the public. The prosecutor would take no position on the application. Defense counsel objected and demanded a public trial. The motion was granted but it may be inferred from the language used by the court that the doors were to be closed only during the testimony of Miss Ward. To follow the subsequent events it may be helpful to quote the exact words of the court: " I think in the interest of good morals and common decency, and in view of the age of this witness, your request is not out of order, and for those reasons and in the interest of justice, I am going along with the request, with leave, however, to the defendant to have present here in the courtroom such persons as his friends and relatives that he feels are necessary to insure his comfort and protection."

After further objections from defense counsel the court withdrew its decision and adjourned court until the following Monday. On the adjourned date statements were made by defense counsel and by attorneys representing various newspapers. These statements included citations of both statute and case law. The matter was fully presented. The Trial Judge retreated from his former ruling that he was excluding the press and public to protect Pat Ward. His final decision was stated as follows: " It becomes the duty of the Court, therefore, in good conscience in the sound administration of justice, and in the interests of good morals, to draw the curtain on the offensive

obscenity of this already over-publicized trial. Public decency compels it. The Court therefore, on its own motion directs that the general public and the press be excluded from the courtroom for the duration of the People's case."

The court was faithful to its ruling. The prosecution rested at the close of the thirteenth day of the trial and the record of the following morning states that "The press and public are present in the courtroom."

We pass to the question of whether the action of the trial court in barring the press and public from the courtroom during the presentation of the People's case deprived the defendant of a public trial. This involves the examination of certain statutory provisions of our State. In attempting to construe these enactments it is necessary to trace their history and development. It is well known that when the Constitution of the United States was proposed by the convention and adopted by the People the omission of a Bill of Rights was made one of the strongest grounds of objection to that instrument during the canvass which preceded its final ratification. Immediately after the assembling of the new Congress, amendments were proposed and speedily ratified which consist of a series of negations of any assumed power to perform certain enumerated acts. They are contained in the first eight articles of the amendments. The Sixth Amendment provides in part that " In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial    *    *    * ".

Our State Constitution contains no similar provision although it has been noted that the Constitutions of forty-one States require that all criminal trials be open to the public (*Matter of Oliver*, 333 U. S. 257, 268, footnote 18). The absence of such a provision is understood when it is remembered that our first State Constitution was adopted on April 20, 1777, some fourteen years before the Sixth Amendment to the Federal Constitution was ratified. It is to be noted, however, that our Legislature on January 26, 1787, passed an act " concerning the rights of the citizens of this State " (L. 1787, ch. 1) which contains many of the provisions now found in our Civil Rights Law. There is no mention therein of the right to a public trial.

This omission, which persisted until 1829, is undoubtedly explained by a study of the interpretation by the courts of the so-called Bill of Rights found in the first eight amendments to the United States Constitution during a period of about forty years after their adoption. The constitutional question soon

arose as to whether these amendments were to be construed as restraining the legislative power of a State or as a restraint upon the Federal Government and not applicable to the States.

An authoritative interpretation of these amendments was given by the Supreme Court of the United States in 1833 in *Barron* v. *Mayor & City Council of Baltimore* (7 Pet. [32 U. S.] 242). The facts in that case applied to only one provision — that which forbids the taking of private property for public use without just compensation. Chief Justice MARSHALL wrote (p. 247) that " The people of the United States framed such a government for the United States as they supposed best adapted to their situation and best calculated to promote their interests. The powers they conferred on this government were to be exercised by itself; and the limitations on power, if expressed in general terms, are naturally, and, we think, necessarily, applicable to the government created by the instrument. They are limitations of power granted in the instrument itself; not of distinct governments, framed by different persons and for different purposes. If these propositions be correct, the fifth amendment must be understood as restraining the power of the general government, not as applicable to the states. In their several constitutions they have imposed such restrictions on their respective governments as their own wisdom suggested; such as they deemed most proper for themselves. It is a subject on which they judge exclusively, and with which others interfere no further than they are supposed to have a common interest." The court concluded that the amendment was intended solely as a limitation on the exercise of power by the Government of the United States, and was not applicable to the legislation of the States.

Earlier the courts of this State had reached the same conclusion. The dates of these decisions become material when considering subsequently enacted legislation. In *Murphy* v. *People* (2 Cow. 815 [1824]) the court had for consideration an appeal from a Court of Special Sessions. It appeared the appellant had been charged with petit larceny and thereafter tried and convicted before three Justices sitting as a court without a jury, as the State statute then provided. It was contended that this violated the Federal constitutional provision requiring the trial of all crimes by jury. It was held that the United States Constitution was not intended to regulate the internal policies of the individual States. In an interesting footnote Chief Judge SAVAGE stated that the same question had repeatedly arisen at

nisi prius at which the decisions had not been uniform. He annexed to the footnote an opinion of the fourth circuit wherein the Fifth and Sixth Amendments were considered and the conclusion reached that they were never intended to limit the powers of the State.

The subject was again considered in April, 1824, by the Court of Errors — then the tribunal of last resort — in *Barker* v. *People* (3 Cow. 686). Barker had been indicted and convicted for the offense of sending a challenge to fight a duel. The punishment provided in substance that a person so convicted should be incapable of holding or being elected to any civil or military office in the State. It was contended that this was a cruel and unusual punishment and prohibited by the Eighth Amendment. The court held that the provisions of the amendment, like other amendments adopted at the same time, was a restriction upon the Government of the United States, intended to deprive that Government of a power, which it had or might claim under the original Constitution. Therefore, each State was at liberty to provide that cruel and unusual punishment should not be inflicted by its own Government. The court pointed out that many States had so provided in their Constitutions but New York had not. It concluded that the Eighth Amendment was inapplicable to offenses against this State.

We thus find that by the year 1825 — although the United States Supreme Court had yet to decide *Barron* v. *Mayor & City Council of Baltimore* (*supra*) — our highest State court had finally decided after several years of conflicting decisions in lower courts that the Bill of Rights found in the first eight amendments to the Federal Constitution only regulated the judicial action of the United States and had no application to judicial procedure in this State. It followed, therefore, that the State — acting by statutory enactment or suitable constitutional provision — could modify existing systems of procedure to any extent in criminal cases, provided such modifications did not " work a denial of fundamental rights " as such rights exist within that narrow circle which the due process clause of the Fourteenth Amendment was later to establish with respect to the States.

In the same year 1825, pursuant to an act passed on November 27, 1824, a group of three revisors was appointed to revise the statutes of this State. Their labors culminated in the Revised Statutes of 1829. We shall look with interest to see if these revisors took action to enact any statutory provision for a public

trial as found in the Sixth Amendment in the light of the recent decision of the highest court of this State that these amendments did not regulate State court action.

The simple and enlightening answer is that the Legislature by the Revised Statutes of 1829 provided in two separate and distinct places for a " public trial ". We first direct our attention to chapter IV of part I, which, as stated by the notes of the revisors, was compiled from chapter 1 of the Laws of 1787, as subsequently amended. We find in section 14 of chapter IV entitled " Of the Rights of the Citizens and Inhabitants of this State " a new provision that " In all criminal prosecutions, the accused has a right to a speedy and public trial   *   *   *." Interesting, indeed, is the footnote to this paragraph which states " 6th amendt. cons. U. S."

Furthermore, the Legislature upon recommendation of the revisors incorporated in the 1829 revision the new provision that " The sittings of every court within this state, shall be public, and every citizen may freely attend the same." (Rev. Stat. of N. Y. [1829], part III, ch. III, tit. I, § 1.)

It is a well-recognized rule of statutory construction that it is relevant to consider the history of the times, the circumstances surrounding the passage of a statute, the mischief felt and the objects and the remedy in view. It has been said that " The traditional Anglo-American distrust for secret trials has been variously ascribed to the notorious use of this practice by the Spanish Inquisition, to the excesses of the English Court of Star Chamber, and to the French monarchy's abuse of the *lettre de cachet*. All of these institutions obviously symbolized a menace to liberty. In the hands of despotic groups each of them had become an instrument for the suppression of political and religious heresies in ruthless disregard of the right of an accused to a fair trial. Whatever other benefits the guarantee to an accused that his trial be conducted in public may confer upon our society, the guarantee has always been recognized as a safeguard against any attempt to employ our courts as instruments of persecution." (*Matter of Oliver,* 333 U. S. 257, 268–270, *supra.*)

If we read history correctly these thoughts must have loomed large in the minds of our lawmakers in the early part of the nineteenth century. The oppression and tyranny of the British were only a few years behind them. Small wonder that when their courts, after years of decisions with conflicting results, finally told these lawmakers that the Sixth Amendment with

its guarantee of a public trial did not apply to their State courts, they hastened to make such an affirmative right a part of the statutory law. Not only did they guarantee to an accused the right to a public trial but they mandated the judiciary that sittings of courts shall be public and every citizen may freely attend the same.

These widely separated provisions of the 1829 Revised Statutes reflect a two-faceted legislative concern for public trials. One relates to the public's right of access to the sitting of a court; and has as one of its major objects the implementation of the citizen's right to observe how his public officers are functioning. This right, given to the public generally, has been modified in the course of the years, as will be hereinafter discussed.

The other provision for a public trial enacted in 1829 vouchsafed such a trial as an essential right of a person accused of crime. This right, linked with such other accepted and essential ingredients of a fair trial as an impartial jury, the right to be informed of the nature and cause of the accusation, of confrontation by witnesses and of compulsory process for obtaining witnesses, has never been abridged and, as we shall show, has remained on the statute books without the change of a single word to this day.

Tracing the subsequent history of these two provisions in the Revised Statutes of 1829 we find that the portion contained in section 1 of title I of chapter III of part III that "The sittings of every court within this state, shall be public, and every citizen may freely attend the same" was contained in the Revised Statutes until Throop revised the Code of Civil Procedure when it was transferred to section 5 of that code. (L. 1876, ch. 448.) Three years later this section was amended to read as follows: "The sittings of every court within this State shall be public, and every citizen may freely attend the same, except that in all proceedings and trials in cases for divorce on account of adultery, seduction, abortion, rape, assault with intent to commit rape, criminal conversation, and bastardy, the court may, in its discretion, exclude therefrom all persons who are not directly interested therein, excepting jurors, witnesses, and officers of the court." (L. 1879, ch. 210.)

This section of the Code of Civil Procedure was repealed by chapter 35 of the Laws of 1909 and re-enacted in section 4 of the Judiciary Law, where it continued unchanged until amended by section 3 of chapter 649 of the Laws of 1945, upon recom-

mendation of the Judicial Council (Tenth Annual Report of N. Y. Judicial Council, 1944, p. 175). This amendment added the word " sodomy " and eliminated the words " criminal conversation " and made certain other minor changes.

The other provision incorporated in the Revised Statutes of 1829 that " In all criminal prosecutions, the accused has a right to a speedy and public trial " was enacted as section 8 of the first Code of Criminal Procedure (L. 1881, ch. 442). It continues to the present in that section. The identical language was incorporated in section 12 of the Civil Rights Law (L. 1909, ch. 14).

We thus find in the Sixth Amendment of the Federal Constitution and in our State statutes a guarantee to an accused of a public trial. While these enactments are identical in language the provisions of the Sixth Amendment as construed and interpreted by the Federal courts do not apply to this State. In other words, the Federal courts in passing upon the right to a public trial construe against the Sixth Amendment while we construe against similar provisions in our statutory law and are not bound by Federal decisions except as the determination may be violative of the due process clause of the Federal Constitution. Therefore, such Federal decisions, as well as those of other States, are not controlling upon us.

Furthermore, over and above the right guaranteed to an accused of a public trial our Legislature has mandated the judiciary in section 4 of the Judiciary Law that " The sittings of every court within this state shall be public * * * ". This applies to every court, even to a coroner's inquest (*Crisfield* v. *Perine,* 15 Hun 200, affd. 81 N. Y. 622), and, of course, relates to civil as well as criminal trials. While the two statutory provisions in a limited sense may be *in pari materia* we conclude that section 4 of the Judiciary Law is much broader in its scope. Moreover, a statute must be read and given effect as it is written by the Legislature, not as the court may think it should or would have been written if the Legislature had envisaged all the problems and complications which might arise in the course of its administration (*Lawrence Constr. Corp.* v. *State of New York,* 293 N. Y. 634, 639).

Before discussing the decisions of this State upon the requirement that the sittings of the court shall be public we refer briefly to some of the Federal decisions upon the subject. *Matter of Oliver* (333 U. S. 257, 258, *supra*) is not in point and has no bearing upon the problem here presented. The distinc-

tion is pointed up in the opening paragraph of the opinion where it is said that ''A Michigan circuit judge summarily sent the petitioner to jail for contempt of court. We must determine whether he was denied the procedural due process guaranteed by the Fourteenth Amendment''. While a similar contention is here raised by the appellant we agree with the prosecution that upon this appeal there is involved no question of due process under the Fourteenth Amendment. The question for determination is whether the defendant was deprived of a fair trial because the sittings of the trial court during the presentation of the People's case were not open to the public. Whatever may be said in the *Oliver* case regarding the law in this State upon that subject is pure dictum and was not necessary to the decision in that case arising in the State of Michigan and relating to its constitution.

Similarly *Tanksley* v. *United States* (145 F. 2d 58) and *Reagan* v. *United States* (202 F. 488) and many like decisions cited by both parties are not in point except as the reasoning therein sheds some light by way of analogy to the problem here presented. Those were cases originating in Federal courts. They were decided upon the construction of the Sixth Amendment, which, as has been shown, is not applicable to cases in the courts of this State.

We recognize the inherent right of a judge to control the conduct locally of a trial over which he is presiding. Thus, he has power to prevent disorder in the court and may exclude particular individuals if good order requires it (*Crisfield* v. *Perine,* 15 Hun 200, affd. 81 N. Y. 622, *supra*), or clear the court-room of spectators for a limited time to preserve order or exclude children. Similarly, he may limit the number of spectators to promote sanitary conditions by keeping the air pure and fresh in what would be otherwise a crowded courtroom. (*People* v. *Miller,* 257 N. Y. 54, 60.)

These and similar local rulings, however, do not fall within the orbit of the action here taken in excluding both spectators and press — the entire public — from a major portion of the trial upon the ground that the case had been over publicized and that the curtain was being drawn in the interests of good morals.

*People* v. *Hall* (51 App. Div. 57) is the only authority holding that such action was justified and we proceed to discuss that opinion. There the defendant had been indicted and convicted of the crime of extortion in that he had obtained money from

a clergyman upon the threat that the latter would be publicly exposed for having committed an alleged act of sodomy with a third person. It appeared that after the jury had been selected the trial court made an order excluding from the courtroom all persons who had no business before the court. When queried as to whether the order extended to representatives of the press, the court said " ' I see no reason why the account of this case should be published '." (P. 59.) Upon appeal the defendant contended he had been deprived of the right to a public trial. The appellate court affirmed. It disposed of section 5 of the Code of Civil Procedure providing that the sittings of every court within this State shall be public and every citizen may freely attend the same except in certain named cases by stating that if a literal interpretation was given the section then a trial judge was without any discretion whatever aside from the excepted cases; that the court would be required to admit " school children ", " street urchins " and a " maudlin drunk or a disturber of decorum ". (P. 61.)

We are unwilling to follow the conclusion reached in that decision. It is plain that the case was not one of those enumerated in then section 5 of the Code of Civil Procedure where the court was authorized to exclude persons not directly interested in the trial. The crime charged was extortion. The evidence of sodomy was incidental to the alleged crime. We have no quarrel with the decision insofar as it states the premise that a court should have the power to bar from the trial school children, small urchins and maudlin drunks. We are unable to follow its reasoning when it passes from that premise to the conclusion that it may bar spectators, members of the press — all of the public — and conduct what amounts to a secret trial in a case not specified in the statute. " Publicity, not secrecy, in arraignment, plea and judgment is part of our tradition. It is deemed necessary not only for individual security but also in the public interest." (*Matter of Rudd* v. *Hazard*, 266 N. Y. 302, 307.)

We believe the conclusion we have reached is in full accord with the subsequent action taken in 1945 by the Legislature. As heretofore stated, the Judicial Council in its Tenth Annual Report, 1944, renewed its recommendation for corrective revision of the Judiciary Law (p. 38). It recommended, among other things, a revision of section 4 so it would read as follows (p. 175) : " Sitting of courts to be public. The sittings of every court within this state shall be public, and every citizen may

freely attend the same, except that in all proceedings and trials in cases for divorce, [on account of adultery] seduction, abortion, rape, assault with intent to commit rape, [criminal conversation] *sodomy,* [and] bastardy or *filiation,* the court may, in its discretion, exclude therefrom all persons who are not directly interested therein, excepting jurors, witnesses, and officers of the court.'' (Matter in italics is new; matter in brackets is old law to be omitted.)

The Legislature followed the recommendation and so revised the section (L. 1945, ch. 649, § 3). Significant is the comment of the council that accompanied the recommendation. It said in part (p. 176) that '' It is further recommended to include sodomy in this section in conformity with the dictum in *People* v. *Hall,* 51 App. Div. 57, (4th Dept., 1900) ' * * * That the protection of a public trial must be given to every defendant charged with a crime is obvious. No court in this nation has ever held otherwise, so far as I am able to ascertain. That principle must be upheld unimpaired, but its retention does not entirely wrest from the trial judge the discretion to conduct the trial in such wise as to be consonant with good morals and common decency and in an orderly manner.' ''

If the council, containing among its membership the Chief Judge of the Court of Appeals and the Presiding Justices of the Appellate Divisions in the four departments had considered the decision in *People* v. *Hall* (51 App. Div. 57, *supra*) as the law of the State, it seems plain that they would have recommended a revision broad enough to cover the rule laid down in that case that '' by this section the court is expressly vested with the authority to exclude people generally from the trial. The present case [extortion] is within the spirit of this statute. The reason that warrants the exclusion of the prying curiosity seekers in an action for divorce exists in this action '' (p. 63). Instead, the council characterized certain general language used by the court as dictum and carefully recommended amendment of the statute to include sodomy but not extortion. Even after the amendment there was no statutory basis for the exclusion of the public in the *Hall* case.

Moreover, if the Legislature had intended to follow the ruling in the *Hall* case it could have adopted a statute similar to section 203 of the Code of Criminal Procedure. For nearly seventy-five years our code has contained the provision now found in section 203 that '' The magistrate may also, exclude from the examination every person except the clerk of the magistrate, the

prosecutor and his counsel, the attorney-general, the district attorney of the county, the defendant and his counsel and the officer having the defendant in custody ''. In the original enactment (L. 1881, ch. 442) this action could be taken only upon the request of the defendant but seven years later this phrase was deleted (L. 1888, ch. 220) and the magistrate was given the present absolute discretion to exclude '' every person '' except those named.

Furthermore, action was taken in this case that we view as more prejudicial to the defendant than that taken in *People* v. *Hall* (*supra*) or any other reported decision that has come to our attention. We refer to the action of the trial court in conducting a closed trial for the presentation of the People's case and an open trial when the defendant presented his case. The original error was thus compounded. Assume for the moment that the court had some inherent power to exclude *from the trial* all persons who were not directly interested therein, including members of the press. Let us further assume that this inherent power was so great that it transcended the statutory enactments upon the subject to which reference has been made. Is it possible to find that the defendant had a fair and impartial trial when it was split in two parts — half closed and half open? The basis for the court's decision was that '' It becomes the duty of the Court, therefore, in good conscience in the sound administration of justice, and in the interests of good morals, to draw the curtain on the offensive obscenity of this already over-publicized trial. Public decency compels it ''. By what means and upon what basis did the court determine that the People's case would be '' offensive '' and the defense would not be. We shall explore one facet of the case and demonstrate how the ruling of the court was of great assistance to the prosecution and prejudicial to the defendant.

There are hints in the record that some of the witnesses to be called by the prosecution might refuse to answer certain questions upon the ground the answers would tend to incriminate or degrade the witness. Thus, Pat Ward's attorney was permitted to remain in the courtroom during the closed sessions to advise her as to her constitutional rights. No such difficulty was encountered. We may only surmise that the secret trial smoothed the path for these witnesses, many of whom were admitted prostitutes.

When the defendant's case is examined we find that the path was not so smooth with the trial open to the press and spectators.

We cite one incident. A witness was called by the defendant to testify in regard to her knowledge of Pat Ward's sexual activities prior to the time she met the defendant. The witness upon the advice of her attorney, who was present, refused to answer upon the ground her answer would tend to degrade her. There the matter rested so far as the defense was concerned. The prosecutor, however, proceeded to ask this nineteen-year-old girl if she ever used drugs and "Are you under the influence of drugs right now. A. No, I am not." All of this, be it remembered, was during the public trial of the defense portion of the case.

Thus, we have a clear picture that so far as the court was concerned the need for privacy vanished at the conclusion of the People's case. Earlier, the court was concerned about requiring the nineteen-year-old prosecution witness, who was an admitted prostitute, to testify in public and said "it might well be a positive disservice to our youth" to have the public hear her testimony. A nineteen-year-old girl called by the defense, however, could be publicly cross-examined about being a drug addict and the court showed no concern that — to use its phrase — "the press of three other continents are reporting this trial." Then to top it off the prosecutor offered no evidence to show the girl used drugs and there was not a scintilla of evidence that she had ever been guilty of an unlawful or immoral act. The most the defense wanted to prove was that the witness had knowledge of certain claimed immoral acts by Pat Ward prior to the time the latter knew the defendant.

It becomes apparent that to place in the hands of any court the power in a criminal trial to close the doors of a courtroom during the presentation of the case of one party and open it when the other party undertakes to present his case creates a situation that should not be tolerated. Any person acquainted with the prosecution of crime knows that many a witness who may testify glibly and falsely in the secrecy of a grand jury room will nevertheless refuse or be reluctant to give the same untrue testimony upon the trial in open court. When such testimony is publicly given, the witness well knows there may be persons who can and will come forward to testify as to the true facts. Moreover, in a case such as this, a half-open and half-closed trial placed an additional burden upon the defendant. The ruling of the court in effect was that if one testified for the People the witness would be shielded from publicity but if one testified for the defense it would be in the pitiless glare of press

and public. We are unwilling to place the stamp of approval upon any such unorthodox and in this case unwarranted procedure. It is unnecessary to speculate as to whether or not the defendant was prejudiced. In *Matter of United Press Assns.* v. *Valente* (281 App. Div. 395, 399) it was said that " The decisions are practically unanimous that a judgment of conviction is reversed on appeal by a defendant, without any affirmative showing of prejudice, if he has not had nor waived a public trial. In that event prejudice is presumed [citing cases].''

Lastly, a few words should be said about a trial which excludes members of the press. We have refrained from discussing our decision in *Matter of United Press Assns.* v. *Valente* (*supra*) for the reason that an appeal therefrom is pending in our court of last resort. It should be emphasized, however, that we are here discussing the rule that the trial of a criminal case is a public event subject to such limitations as have heretofore been discussed. Generally speaking what takes place in a courtroom is public property (cf. *Craig* v. *Harney,* 331 U. S. 367, 374). We are not faced with the question whether newspaper accounts published during or prior to the trial aroused such prejudice in the community that appellant's trial was " ' fatally infected ' '' with an absence of " ' that fundamental fairness essential to the very concept of justice ' '' (*Stroble* v. *California,* 343 U. S. 181, 191). Nor is there presented a situation in which the District Attorney has released any so-called " confessions " or made any pretrial statements as to evidence in his possession, as indeed he should not (cf. *Shepherd* v. *Florida,* 341 U. S. 50). Such statements, in the interests of preventing unfairness and prejudice to a defendant yet to be tried should not be made public without adequate justification.

We comment on the rights of the press because the decision of the trial court to close the trial was to a large extent based upon its stated opinion " that such extensive press coverage to a case of this kind is catering to vulgar sensationalism, if not actual depravity ''. We conceive it to be no part of the work of the judiciary upon the facts here presented to decide what a newspaper prints or to what portion of the people it caters to sell its papers. A judge may have his personal opinion as to the good taste of what may appear in public print but when serving as a judicial officer he has no right in a situation such as this to restrain or dictate what portion of court proceedings shall be made available for reading by the public. If abuses exist, they are the proper subject for correction by the People

through constitutional amendment or by statutory enactment by their duly elected representatives in the Legislature.

The judgment appealed from should be reversed and a new trial granted.

CALLAHAN, J. (dissenting). Defendant, after trial before the court and a jury at General Sessions, has been convicted on two counts of compulsory prostitution involving two different women.

The entire court appears to be in agreement that the evidence was ample to sustain the verdict pronounced by the jury. Nevertheless, the majority is about to reverse the judgment for alleged errors, particularly the failure to afford a public trial to the defendant.

The prevailing opinion discusses at length two inquiries made of jurors Numbers 5 and 11 concerning their qualifications. While it terms the procedure followed " serious error ", it does not base reversal on that ground alone, but rather on the steps taken to exclude the public from the courtroom during the People's case. Under the circumstances, we think that there is nothing to be gained by extended discussion of the incidents connected with the questioning of the jurors. We deem it sufficient to say that we find the trial court acted within its powers and exercised its discretion so as to protect the rights of the defendant. We find no error, reversible or otherwise, in what occurred in connection with these two incidents (see *People* v. *O'Keefe,* 281 App. Div. 409, 412, affd. 306 N. Y. 619). Experienced trial counsel did not move for a mistrial after the conclusion of these inquiries, nor did defendant at any time object to proceeding with the selected jury after the inquiries took place.

Accordingly, we pass to the question of error assigned as ground for reversal and based on the alleged deprivation of the right to a public trial. We disagree squarely with any finding that there was not a " public " trial in this case as that term is used in the relevant statutes. We view with great concern the decision about to be made, and regard it as dealing a serious blow to the power of a court in the proper conduct of trials and judicial proceedings. We think that it runs counter to the public policy as expressed in the statutes of this State for almost a century. The ruling means that a trial court faced with the fact that obscene and salacious testimony will be disclosed upon a trial is powerless to prevent the courtroom from becoming a source of supply of filthy " news " to be broadcast indiscrimi-

nately by the press, or others in attendance, who may wish to spread the same. We are firm in our belief that under the existing law courts of justice need not and should not be such compulsory sources of supply.

Upon the present trial, after the opening of counsel to the jury, the presiding Judge stated his belief that the testimony would be steeped in filth, and that the indiscriminate release of the obscene and sordid details might be a disservice to youthful members of the community. Accordingly, in the interests of good morals and public decency, the court decided to exclude the general public and the press from the courtroom for the duration of the People's case. The court stated that it recognized the necessity for a public trial and granted the right to the defendant to have present in the courtroom any reasonable number of his friends and relatives as he might deem necessary, who would not violate the spirit of the ruling against the undesirable publicity. This ruling was enforced over defendant's objection.

There were present in the courtroom, however, during the People's case, in addition to the jury, counsel for defendant and the People, the court personnel, including stenographers, and as many as seventeen different members of the public, all friends of the defendant and selected by him or his lawyer. Sometimes as many as twelve, sometimes less, but always at least one of these persons was in attendance at the various sessions of court throughout the trial, including the People's case.

During the course of the trial, several newspapers and press associations commenced litigation to compel the trial court to admit them to the trial for the purpose of reporting its details in the press. They moved for an order in the nature of a writ of prohibition against the enforcement by the trial court of its direction for their exclusion. The motion for this writ was denied by Special Term of the Supreme Court, and that order was affirmed by this court (*Matter of United Press Assns.* v. *Valente*, 281 App. Div. 395). Our decision in that case was based principally on the ground that the petitioning newspapers had no legal standing to bring such a proceeding. We expressly held that the merits of the question as to whether there was a deprivation of the right to a public trial or any error prejudicial to defendant would have to await decision upon an appeal by defendant.

Passages in the majority opinion of this court in the *United Press* action are sought to be interpreted as indicating that we

believed that error would be found on defendant's appeal because of the exclusion referred to. Examination of the opinion, however, will show that such construction is unwarranted. Any reference to prejudice arising from the absence of a public trial was clearly confined to a case where, in fact, there had been denial of a public trial. There was no indication of a finding that such result had occurred in the Jelke trial. Upon the complete trial record we now vote to hold that the proof does not disclose the absence of a public trial as that term is used in the Federal Constitution or the statutes of this State.

There is an express provision in the Sixth Amendment of the Federal Constitution that the accused in a criminal prosecution is entitled to a speedy and a " public " trial. The Fourteenth Amendment provides that no State shall deprive a person of life, liberty or property without due process of law.

The Sixth Amendment to the Federal Constitution, as the United States Supreme Court has expressly held, " does not apply to the trial of criminal prosecutions by a State " (*Gaines* v. *Washington,* 277 U. S. 81, 85). It applies to trials in United States courts alone and is not a restriction on the powers of State governments (*Matter of Sawyer,* 124 U. S. 200, 219; *Spies* v. *Illinois,* 123 U. S. 131, 166). We agree, however, that the protective cloak of the Fourteenth Amendment might cover a case where a criminal trial in a State court is entirely " secret " and *in camera* as distinguished from " public ". Lack of due process could be found in such circumstances (*Matter of Oliver,* 333 U. S. 257). But, as the majority of this court appear to recognize, the kind of trial that merits the label of " secret " and violative of the constitutional requirement of due process is not one like the present, where defendant was represented by counsel of his selection before a court and jury, the proceedings duly recorded, and defendant afforded the right of calling witnesses and of spectator attendance to the extent that he might choose or select from his friends and acquaintances. A reading of the opinion in the *Oliver* case (*supra*) will demonstrate the difference between the trial involved here and the kind of star-chamber, one-man summary inquisition, without the right to counsel or witnesses, that was condemned there as lacking in due process. A footnote at page 272 of the opinion in the *Oliver* case indicates that the Supreme Court considered trials precisely like the present where there was exclusion of the public to a limited extent, i.e., where only selected friends of the defendant were admitted, and did not indicate that such procedure

would deprive a defendant of a " public " trial.  The footnote cited *People* v. *Hall* (51 App. Div. 57) where the exclusion was identical with that in the present case.

The highest courts of other States have held that due process is not violated merely because some of the public is excluded (*Commonwealth* v. *Blondin,* 324 Mass. 564; *Moore* v. *State,* 151 Ga. 648).

The requirements for a " public " trial in this State are found in three separate statutes.  The Code of Criminal Procedure (§ 8) and the Civil Rights Law (§ 12) provide for speedy and public trials in criminal cases.  In addition, section 4 of the New York Judiciary Law provides: " § 4. *Sittings of court to be public.*  The sittings of every court within this state shall be public, and every citizen may freely attend the same, except that in all proceedings and trial in cases for divorce, seduction, abortion, rape, assault with intent to commit rape, sodomy, bastardy or filiation, the court may, in its discretion, exclude therefrom all persons who are not directly interested therein, excepting jurors, witnesses, and officers of the court."  These statutes are *in pari materia* and must be read together (*Matter of United Press Assns.* v. *Valente,* 281 App. Div. 395, *supra*).  Assuming that any of these sections were intended to furnish in State trials protection equivalent to that afforded by the Sixth Amendment in Federal trials, there can be no doubt that in New York such protection was to include an exception to the extent provided in section 4 of the Judiciary Law.

It will be noted that the exceptions in section 4 permit the exclusion of those not directly interested in all proceedings and trials in cases for divorce, seduction, abortion, rape, sodomy, etc. This, on its face, would be broad enough to permit exclusion of all spectators and the press, at least to the extent necessary to protect the public morals by preventing the broadcasting of sordid details.  In the instant case there was exclusion of the press and limitation in the number of spectators.  But, says defendant, the present trial was not a case of the kind expressly specified in section 4, as it was a prosecution for compulsory prostitution.  We construe the section more broadly.  We agree with the construction placed on it in *People* v. *Hall* (51 App. Div. 57, *supra*), where the court said (p. 63): " It will be observed that the cases enumerated are those in which the testimony is apt to be too indecent for the public to hear.  *  *  *  The object of these exceptions was in the interest of public morals, and the intent probably was to include all cases in which testi-

mony of an obscene character was likely to be given. Careful as our lawmakers have always been of the rights of the defendant, by this section the court is expressly vested with the authority to exclude people generally from the trial. The present case is within the spirit of this statute. The reason that warrants the exclusion of the prying curiosity seekers in an action for divorce exists in this action.''

We think that any construction of the section so as to make it inapplicable to a case of compulsory prostitution involving incidents of sodomy, sex perversion and commercialized vice would defeat the very object of the law. To exclude the public from a trial of one of the specifically enumerated classes, where the testimony might be comparatively harmless, and permit the dissemination of the evidence in a case of compulsory prostitution, with the obscene and sordid details found here, would be elevating form over substance and ignoring the spirit, purpose and intent of the law. An action to annul a marriage might involve details far more invidious to publish than an action for divorce. Clearly, the Legislature intended that it was to be the nature of the testimony, and not the nature of the charge involved, that would invoke the exclusion of the public.

Section 4 of the Judiciary Law was amended at the suggestion of the Judicial Council in 1945 to include '' sodomy '' among the cases in which the public could be excluded. The Judicial Council reported that this amendment was intended to meet the dictum in *People* v. *Hall* (*supra*). The crime charged in the *Hall* case was extortion, but the exclusion of the public was based on obscene testimony relating to alleged sodomy. It is thus apparent that the Judicial Council considered that it was the nature of the testimony, and not the nature of the charge, that controlled the exclusion of the public.

In our opinion the Federal decisions as to what constitutes a public trial are not helpful to a resolution of this appeal. Proceedings in those courts are controlled by the Sixth Amendment, which has been enforced quite strictly in many instances. Congress has never adopted a statute similar to section 4 of the Judiciary Law. New York, on the other hand, has no provision in its Constitution requiring a public trial. Its Legislature has the power, therefore, to prescribe any exception with respect thereto not violative of due process. The Legislature of New York, exercising this power, adopted section 4 of the Judiciary Law. New York courts are required to give due consideration to the fact that the requirements for a public trial are found in

a statute granting power to a presiding judge to exclude those members of the public not directly interested in cases of a nature likely to involve obscene and salacious testimony.

New York, thus, recognizes that the protection of a public trial afforded the individual is coupled with a provision for the protection of the morals of the public at large in cases of a nature likely to produce evidence of obscenity. The requirement for a public trial will not be deemed infringed, therefore, when the protection of public morals is being reasonably exercised. There would seem to be no inconsistency in the two provisions, nor any interference with the rights of an individual defendant to a public trial, at least, where the presiding judge permits him to have in attendance such persons as he may select, who will honor the condition of preventing dissemination of obscene details.

It is widely recognized that the public generally may be excluded from trials involving testimony of a salacious nature without infringing the constitutional requirements of a public trial. In an article (49 Col. L. Rev. 114) on "The Accused's Right to a Public Trial", it was said: "In general, the cases in these jurisdictions indicate that the guarantee of public trial presents no serious obstacle to the exclusionary power of the trial judge, so long as he is motivated by the obscene character of the trial, and so long as the presence of someone other than the participants in the trial is permitted. In many of these states statutes expressly provide the judges with discretionary power to bar spectators from salacious cases and these enactments have not been deemed to conflict with the constitutional guarantee."

New York has adhered to this view for generations. For more than seventy-five years section 4 of the Judiciary Law has been on the statute books substantially in its present form.

In *People* v. *Hall (supra)* the court declared (p. 61): "That the protection of a public trial must be given to every defendant charged with a crime is obvious. No court in this nation has ever held otherwise, so far as I am able to ascertain. That principle must be upheld unimpaired, but its retention does not entirely wrest from the trial judge the discretion to conduct the trial in such wise as to be consonant with good morals and common decency and in an orderly manner."

Suggestion is made by appellant that the authority of the *Hall* case was weakened by a later decision of the Court of Appeals in *People* v. *Miller* (257 N. Y. 54, 60). In the *Miller* case a defend-

ant was charged with murder. The exclusion of some of the public was based on the Trial Judge's belief that such exclusion would afford better sanitary conditions in the courtroom for the protection of jurors and others whose duty required their attendance. There was no question of salacious evidence being presented, and thus the general rule, and not the exception in section 4 of the Judiciary Law, was involved. The right to claim lack of a public trial was held to have been waived in that case, and the decision in no wise limits the authority of *People* v. *Hall* (*supra*).

It is also suggested that the Trial Judge erred in closing the doors during the taking of the People's testimony while opening them on presentation of the defendant's case. Defendant says that this procedure afforded an unfair advantage to the People. We fail to see the force of this contention. If, as his counsel then urged, defendant wished the trial to be public, he lost nothing by having it so conducted during his own case. Instead, he gained part of what he sought, and he made no objection, except to the original ruling. The trial court may well have believed that the testimony offered by defendant would be less offensive to the public. It did appear that the most obscene testimony was that elicited on the cross-examination of the prosecutor's witnesses, when counsel for defendant went into great detail in attempting to show that the girls involved, though young in years, were deep in the experience of moral degradation. It would seem, therefore, there was no error in lessening the rigor of the restrictions.

What we have said so far relates to the power of the court to proceed as it did. That power involves the exercise of discretion. There remains the question whether that discretion was properly exercised.

The proceedings had in public between February 2d, when the first juror was picked, and February 6th, when the doors were closed, gave promise of a panorama of prostitutes, procurers and perversion. There were to be details as to sordid relations between a young man of good family and girls he was charged with schooling to be prostitutes. There would be proof that he was consorting with husbands living off the proceeds of their wives' shame. Methods pursued in obtaining male customers for the fallen women, and advice as to how they could best extract the price to be paid for their favors, was to be the principal subject of discussion. Cross-examination promised to descend into detailed interrogation as to the

extent of the prior sex experiences of the women and the perversions they had practiced.

It was in the light of this state of facts, and the lurid newspaper accounts thereof, that the trial court decided in the interest of good morals and common decency to draw the shade on the proceedings in such manner, however, as to preserve the elements of a public trial. Whether the performance actually lived up to advanced billing in sections of the public press is not the question. At least, there was much in the testimony that would better be kept from being broadcast to all the public, including young and immature persons.

And how was the press then handling the case? That some of the papers were not attempting to exercise any restraint was proclaimed by counsel. Indeed, he asked the court to take judicial notice that it was "first page headline news everywhere." He added that the publicity was such that the face of one of the young prostitutes had been made known to every man and woman in the city. Resort to the files of some of the newspapers will show conclusively that this was no overstatement. By bold headlines and subjoined articles there was the widest public exposition of the details of depravity. That the trial adequately might be reported without offense to public decency was demonstrated in the coverage afforded by one metropolitan journal that was the exception rather than the rule.

We do not wish to appear to dictate what should be the proper sense of journalistic values and self-control by the press in reporting crimes of sex and obscenity. The law does not impose such responsibility upon us. We are charged, however, with enforcing a law, the whole object of which is to prevent court sessions from becoming polluted wellsprings from which most obscene material offensive to public decency and morals will flow without any restriction (Judiciary Law, § 4).

The majority is holding, in effect, that when a trial court, in its judicial discretion, decides to regulate its business under such a law so as to safeguard the common good by curbing prurient and morbid curiosity aroused through the publicity given to a trial of the exceptional nature of this case, it commits reversible error and deprives the defendant of his individual rights. From now on, under the majority rule, a courtroom must be the source of supply for this prurient stream whether the judge is convinced that it is his duty, in the exercise of sound judicial discretion, to avoid this result or not. We think that the public policy of this State should be and is otherwise.

On all the facts disclosed, we vote to hold, in the discretion of this court, that the learned judge at General Sessions exercised a reasonable and sound judicial discretion.

A trial involving charges of the present nature must deal with the most sordid details of human lives that may fall lower than the bestial. However, there is no reason in law or morals why the court should be the source of supply of these degraded and degrading obscenities for consumption by the public, including the very young and immature. It is a strange and paradoxical ruling that while the young and immature may be refused admittance at the door of the courtroom, the court is powerless to protect them against news broadcasts of the trial obscenities into every home, and is also powerless to protect public morals generally.

Leading text writers on the law have always recognized the power of a court to check the dissemination of testimony of salacious and obscene acts emanating from its own session.

Wigmore states that one of the ordinary grounds for exclusion of the public from the courtroom is to avoid " the moral harm of satisfying pruriency in trials of certain crimes ". That most eminent writer, after pointing out that no tangible and positive advantage is gained by a party in a given case by publicity or lost by privacy, states that the requirement for a public trial is not absolute or invariable, and cites numerous cases where under a variety of statutes — and in the absence of statute — in trials involving crimes of rape and the like, the power of exclusion was applied in varying degrees (6 Wigmore on Evidence [3d ed., 1946], § 1835, p. 338). Bowers, in his work on Judicial Discretion of Trial Courts (p. 297), labels the power of exclusion under such circumstances as a necessary aid in protecting public morals, and cites many cases in numerous jurisdictions supporting such power.

Concededly, in the reported cases it is rarely that the press is excluded. We would prefer that it would never be necessary to do so in this jurisdiction. But on the particular facts before us, we are merely deciding whether it was error to do so in this case. Cases suggesting that it might be improper to exclude the press involved situations where there was no statute comparable with section 4 of our Judiciary Law. For us the public policy has been expressly declared by the Legislature to the effect that there may be an order of exclusion, including the press, where the testimony is likely to relate to obscene and salacious sex crimes. Unless this statute is unconstitutional,

it was the duty of the Trial Judge to enforce it in accordance with the dictates of his conscience and his understanding of the law and the facts. It is our duty to uphold the Trial Judge, unless he is in error. It is for us to review the discretion exercised by the trial court, but in doing so we must be guided by the language of the statute and the facts concerning the nature of the testimony likely to be adduced in the course of the trial.

We have discussed the case solely from the viewpoint of the statutory provisions affecting the question without regard to the inherent power of a court to close its doors in certain circumstances. We refer to our earlier decision (281 App. Div. 395) on this phase of the problem.

The majority opinion would seem to indicate that the provisions of section 8 of the Code of Criminal Procedure and section 12 of the Civil Rights Law in requiring a public trial should have some over-riding effect, for it suggests that other statutes are to be " construed against " the above sections. It says that these sections requiring a public trial are only to a limited extent *in pari materia*. That the Legislature has never understood the first two sections mentioned as limiting its powers is apparent. It has, subsequent to their enactment, passed such statutes as section 45 of the Children's Court Act providing for privacy in cases of juvenile delinquency, and made like provision in cases of youthful offenders (Code Crim. Pro., § 913-k).

There was ample evidence to support the conviction of defendant, including lists in his own handwriting of the names and telephone numbers of men referred to the prostitutes by him. In fact, defendant's guilt was established by such overwhelming evidence that no rational expectation can be entertained that on any retrial the result would be different. It appears that the majority concurs with this view of the case. To direct a retrial of a case of this kind, on the ground that defendant was deprived of a fair trial by the inquiries made of the jurors or by excluding the press is, in our opinion, most unrealistic and unnecessary.

We agree that it was no part of the Trial Judge's work to censor news. But it was the Judge's sworn duty to see that section 4 of the Judiciary Law was obeyed. We construe that section to mean that a judge must decide when the evidence in the case will relate to occurrences of the nature listed in the section, and in such cases he may confine attendance to those interested in the case. The statements in the majority

opinion suggesting that some statute or constitutional amendment is needed, if the Judge is to perform such function as to exclude the press in a case like the present, is an attempt to distort and read out of existence section 4 of the Judiciary Law, which has been the law for seventy-five years and sets forth the settled public policy of this State.

The public order and decency generally prevailing in the city of New York, where the instant trial was conducted, exists not because of the relatively small number of law enforcement officers and judges charged with the responsibility of maintaining the peace and safety of the community, but is principally the result of the invisible, but real, adherence of the overwhelming majority of the people to the traditional concepts of morality, decency, law and order. Without such adherence there would be chaos. Unquestionably, it is this true sense of right, honor and virtue as well as a decent respect for public opinion that stands in the way of disorder and licentiousness. If this source of law and order is to be corrupted from the courtroom, every judge, so compelled to " blow the horrid deed in every eye ", is placed on the side of obscenity and vice. This was neither the philosophy nor the intent behind section 4 of the Judiciary Law, which will be rendered practically a dead letter under the majority decision of this court.

The judgment appealed from should be affirmed.

BREITEL and BOTEIN, JJ., concur with BASTOW, J.; CALLAHAN, J., dissents and votes to affirm in opinion, in which DORE, J. P., concurs.

Judgment reversed and a new trial ordered.