Markowitz, J.
(dissenting). Tenant is a statutory tenant of an apartment in 14 East 73rd Street, New York. House Rule 11 of his lease provided that the landlord may retain a^passkey to the apartment and that the tenant shall not alter any lock or install a new one without the landlord’s written consent. “In case such consent is given, the Tenant shall provide the Landlord with an additional key for the use of the Landlord pursuant to the Landlord’s right of access to the demised premises.”
Rule 11 lost its validity in 1968 when section 51-c of the Multiple Dwelling Law took effect. Under section 51-c, every tenant *975 of a multiple dwelling is granted the right to install a lock in the entrance door to his housing unit, separate from that installed by the landlord, ‘ provided that a duplicate key to such lock shall be supplied to the landlord or his agent upon his request ’ ’.
The section does not spell out the circumstances under which the key is to be “ supplied This much, however, is clear: the circumstances giving rise to the right of a landlord to a key cannot be coextensive with the prior practice of landlords to retain passkeys, for then the enactment of the section will have been a vain act. The duplication of passkeys and their wide availabality to former owners, former agents and former employees, let alone to current owners, agents and employees, was the very reason for adopting section 51-c. To construe the section as granting landlords the unlimited right to demand a duplicate key, without reason, or even so that he may have one in his possession, would tend to re-establish the conditions which brought it into being.
The purpose of lease provisions calling for a landlord’s consent before a lock may be changed or added, and for the delivery of a duplicate key to the landlord should a lock be changed or a new lock added, is to protect the property in an emergency, to facilitate repairs to the premises, and to give this landlord the opportunity to show the apartment to proposed purchasers of the building or proposed new tenante of the apartment. As against these aspects stand the tenant’s rights of privacy, safety and security, not lightly to be disregarded. Indeed, these rights are protected by the lease itself (art. 14). Landlord’s right of access, referred to in rule 11, is limited to “ reasonable hours ” and for stated limited purposes. Only if tenant is not present to permit entry ‘ ‘ when entry therein shall be necessary or permissible hereunder” could landlord use his passkey or forcibly enter the apartment. Contained in a house rule, the requirement that landlord be provided with a duplicate key did not go to the essence of the tenancy.
Of particular relevance is the limitation of the landlord’s use of the passkey or force to obtain entry to when the tenant ‘ shall not be personally present to open and permit an entry into said premises ”. Ordinarily, during reasonable hours, a tenant is present in the apartment, or can arrange to be present; invasion of the apartment in tenant’s absence is totally unnecessary; and the use of a pass or a duplicate key seldom, if ever, is required.
Section 51-c of the Multiple Dwelling Law is one of a series of three sections enacted for the benefit of tenants. Section 51-a directs owners of multiple dwellings to provide a peephole in *976 the entrance door of every housing unit in the building. Section 51-b makes mandatory a mirror in every self-service elevator. Section 51-c gives every tenant in a multiple dwelling the right to install a new lock in his entrance door. The last section was quite obviously enacted to permit greater protection of the tenant ’s person and property. Equally obviously it was not enacted to provide landlords with an added weapon with which to destroy tenancies and to decontrol apartments. Yet, to construe a tenant’s act of self-protection in refusing to give the owner permanant custody of a duplicate key to his apartment as a breach of a substantial obligation of his tenancy, would put into the hands of landlords precisely such a weapon, unanticipated by the Legislature and unexpected by both landlords and tenants.
Bule 11 and the superseding statute must be read in this light.
In some circumstances, said Holmes, J., a page of history is worth a volume of logic (New York Trust Co. v. Eisner, 256 U. S. 345, 349). The intent of a statute is collected from its language applied to the subject matter in light of the public and notorious facts existing when the statute was enacted (Brown v. Mayor of City of New York, 63 N. Y. 239, 244; People v. Koch, 250 App. Div. 623; 624-625; People v. Lo Pinto, 49 Misc 2d 997, 998-999). In determining its meaning,'the mischief the act was designed to remedy and the history of the period are relevant factors (Wiley v. Solvay Process Co., 215 N. Y. 584, 588; People v. Jelke, 284 App. Div. 211, 223-224, affd. 308 N. Y. 56). “ Consequences cannot alter statutes, but may help to fix their meaning. Statutes must be construed, if possible, that absurdity and mischief may be avoided ’ ’ (Matter of Rouss, 221 N. Y. 81, 91 [Cardozo, J.]; People v. Ryan, 274 N. Y. 149, 152; Matter of Washington St. Asylum & Park R.R. Co., 115 N. Y. 442, 448; Jewish Hosp. of Brooklyn v. “Doe,” 252 App. Div. 581,585).
The statute before us lends itself to a more reasonable construction than return to the status quo ante: a duplicate key may be demanded by a landlord when needed or in any emergency. When the need or emergency is over, the key should be returned to the .tenant.
The unfortunate present climate of crime and violence mandates such a construction. “ The volume crush of criminal justice is nowhere more evident than in New York City. The crime rate here, as in any urban area, is intensified.” (1972, Criminal Justice Plan, Executive Committee Criminal Justice Coordinating Counsel, pp. 5-6.) In its release dated January 26,1972, the New York City Police Department reported a total of 181,331 *977 burglaries for 1971. Burglary arrests amounted to 15,847 — or somewhat less than 9% of this total (ibid.). In such circumstances, the needs of tenant safety and tenant security, let alone their right of privacy, preclude the construction of the statute to require a tenant to supply a key to his apartment to his landlord merely to satisfy the latter’s desire to have one in his possession.
It is, of course, not my purpose to imply that the dangers referred to in this opinion are chargeable to landlords or their employees. My point is that passkeys and apartment keys, collected in one place, facilitate illegal duplication inside and outside landlord organizations and illegal entry into apartments; and that the intent of section 51-c of the Multiple Dwelling Law was not to bring such a situation about; that, to the contrary, its intent is to limit the availability of the keys to the times and occasions when they are needed by a landlord.
The agreed statement of facts at bar provides that landlord has demanded that tenant supply a key to his apartment, but gives no reason whatever for such demand. Demand, without reason, is, in my view, insufficient to call for compliance by tenant.
But even if demand without reason called for compliance by the tenant, refusal to comply does not constitute such a material breach of the tenancy as to authorize the eviction of the tenant. The forfeiture of a leasehold will not be declared when the condition in question is insubstantial or of a trifling nature (Moss v. Hirshtritt, 60 Misc 2d 402; Jerome Realty Co. v. Yankovich, 35 Misc 2d 183; Madison Stores v. EnKay Sales Corp., 207 Misc. 1091; 6th Ave. & 24 St. Cory. v. Lyon, 193 Misc. 186,188).
The statute by its terms calls for no such result from failure to supply a landlord with a duplicate key; and the record before us is utterly devoid of proof that landlord at bar was, or will be, seriously damaged by tenant’s refusal to do so in this instance.
Nor is landlord without remedy. My brethren have held that keeping a dog in contravention of a lease provision is not a violation of a substantial obligation of the tenancy so as to warrant forfeiture of the leasehold; that a house rule proscribing harboring a dog is enforceable by injunction action only (930 Fifth Corp. v. King, N. Y. L. J., May 2, 1972, p. 2, col. 2, 3). “ This distinction in enforcement, based upon the remedy sought,” my brethren said, “ is understandable since ‘ the impact of a holdover proceeding seeking the ouster of a tenant and resulting in a forfeiture of the tenancy cannot be compared with *978 the milder form of injunctive relief. ’ (Madison 52nd Corf. v. Ogust, 49 Misc 2d 663, 664; see, also, Emrite Realty v. Neal, 196 N. Y. S. 2d 883.) ” All the more is this so where the tenant’s personal security depends on his retaining the keys to his apartment. If landlord really needs permanent possession of a key, and if a court of eefuity agrees with him, he can obtain it through the court’s directive to that effect. Should the problem become acute, there is available to him his rights under section D26-10.07 of the Administrative Code and the rules adopted thereunder, the powers of the police and fire departments, and landlord’s lawful practical remedies to gain admission to the apartment in an emergency.
It is pertinent to note in that connection that section D26-10.09 of the Administrative Code covers the subject of tenant viola-ions as ground for eviction. It provides that any conviction of a tenant for violation of the code which (1) results from willful nr grossly negligent conduct and causes substantial damage to the dwelling units, or (2) results from repeated or continued conduct which causes damage to the dwelling unit or substantially interferes with the comfort or safety of another person or (*3) consists of an unreasonable refusal to afford access to the dwelling unit to the owner or his agent for the purpose of making repairs or improvements required by the code, constitutes grounds for summary proceedings by the owner to recover possession of the dwelling unit from the tenant. This is surely far from providing, expressly or by implication (as my brethren hold), that a violation of the code is a crutch to section 51-c of the Multiple Dwelling Law, raising a violation of that section to the status of a substantial violation of the tenancy.
I, therefore, dissent and vote to affirm.
Quinn, J. P., and Streit, J., concur in Per Curiam opinion; Markowitz, J., dissents ip. memorandum.
Final judgment reversed, etc.