In the Matter of RICHARD OLIVER et al., Individually and on Behalf of Other Members of the Public and Press Similarly Situated, Petitioners, *v.* GEORGE POSTEL, Individually and as a Justice of the Supreme Court of the State of New York, Respondent.

First Department, December 1, 1971.

*Jacob D. Fuchsberg* of counsel (*Murray L. Lewis* and *Leo Pfeffer* with him on the brief; *Fuchsberg & Fuchsberg,* attorneys), for petitioners.

*Robert S. Hammer* of counsel (*Samuel A. Hirshowitz* with him on the brief; *Louis J. Lefkowitz, Attorney-General,* attorney), for respondent.

*Henry J. Boitel* of counsel (*Maurice Edelbaum,* attorney), for Carmine J. Persico, Jr., *amicus curiae.*

The New York Times Company, Inc., National Broadcasting Company, Inc., Columbia Broadcasting System, Inc., The New York Post Co., The Radio-Television News Directors Association, New York News, Inc., Newspaper Reporters Association of New York, Inc., New York Civil Liberties Union, Sam Polur, *amici curiae.*

KUPFERMAN, J. This is a petition in an article 78 proceeding by five newspapermen to compel '' Respondent to open his court to the public and press ''.

Leave has been given for briefs amici curiae by various newspaper and broadcasting organizations and other interested parties. A brief has also been filed on behalf of Carmine J. Persico, Jr., the defendant in a criminal trial which prompts this proceeding.

Judge GEORGE POSTEL, an experienced Trial Judge, was presiding at the trial of defendant Persico. During the first day of the presentation of the evidence, in his discretion as a Trial Judge, he told the newspapermen covering the trial that he thought mention of matters in the newspaper coverage of the case that did not transpire at the trial itself, might be prejudicial to the defendant. Counsel for the defendant had called his attention to, among other things, newspaper items concerning the defendant's alleged associations.

His suggestion was treated as a news story with editorial comment, and, thus, added emphasis was given to the areas that concerned him with respect to the effect on the jury in the trial before him.

The next day, the defendant moved to exclude the public and the press from further trial proceedings and that the transcript of the trial be sealed from access to anyone other than counsel and the court until the case had been finally determined by the jury, and the motion was granted.

In the Trial Judge's discretion, this was necessary to protect the defendant's right to a fair trial, so that there would be no basis, in the event of conviction, for reversal. (*Sheppard* v.

*Maxwell,* 384 U. S. 333 [1966]; *Estes* v. *Texas,* 381 U. S. 532 [1965].) Whether this action was an abuse of discretion can be tested on appeal at the appropriate time.

In the case of *Matter of United Press Assns.* v. *Valente* (308 N. Y. 71, 76 [1954]) involving the order made by a Trial Judge " excluding the general public and the press from the courtroom ", the Court of Appeals did not decide the matter until after their determination with respect to the rights of the defendant. It was first held that the defendant had been deprived of his right to a public trial (*People* v. *Jelke,* 308 N. Y. 56) and his conviction reversed.

In any event, the question is foreclosed by the determination in the *United Press* case (*supra*), where the Court of Appeals, speaking through FULD, J. (now Chief Judge FULD) decided that the members of the public at large, including the press, possessed no enforceable right or privilege of their own to insist that trials be open to the public.

Judge FULD stated (p. 81): " Actually, petitioners are seeking to convert what is essentially the right of the particular accused into a privilege for every citizen, a privilege which the latter may invoke independently of, and even in hostility to, the rights of the accused. A moment's reflection is enough, we suggest, to demonstrate that that cannot be, for it would deprive an accused of all power to waive *his* right to a public trial and thereby prevent him from taking a course which he may believe best for his own interests." In the pending matter, the defendant Persico asked for the exclusion, unlike the situation in the *Jelke* case, making this an a fortiori situation.

In view of the dissent, perhaps some further thoughts should be expressed.

If a person is on trial in a criminal matter, there is always a delicate balance between the rights of society and the rights of the defendant. Any nuance can bring weight on the scales of justice. A conscientious prosecutor can prepare a thorough case on behalf of the People and find that a deserved conviction must be reversed because of extraneous circumstances which may have affected the jury determination.

The Judge must be alert to avoid the opportunity for error that could lead to a new trial at public expense, with new tribulations for the court, juries, witnesses, etc. (See, e.g., *People* v. *Kirkup,* 13 A D 2d 987 [2d Dept. 1961].) These are not " instant replay " situations. At the same time, the defendant must not be prejudiced by being forced to an appeal and a further trial if the jury is unduly impressed by extrinsic material. When a defendant specifically raises an issue of prejudice, it rests in

the sound discretion of the Trial Judge to protect his rights and that of the public.

As former Chief Justice EARL WARREN put it, these are '' restraints society must observe consistent with the Federal Constitution in prosecuting individuals for crime.'' (*Miranda* v. *Arizona,* 384 U. S. 436, 439).

The law limits coverage of court proceedings in other situations, e.g., matrimonial matters (Domestic Relations Law, § 235 [formerly Rules Civ. Prac., rule 278]) (*Danziger* v. *Hearst Corp.,* 304 N. Y. 244). Broadcast journalism is not permitted (see 22 NYCRR 20.5 [Rules and Regulations of the Judicial Conference of the State of New York]).[1]

It has been blithely suggested that one way to substitute for the action of the Trial Judge here, is to sequester the jury. Perhaps the infringement on personal liberty thus involved has not been considered of moment to those that urge this view, but it means that members of a jury (plus alternates, CPL 270.30) who are performing a public service, many times against their will but in the exercise of citizenship (Judiciary Law, § 596), will be taken from family and friends for possibly long periods of time at considerable cost and inconvenience. This is a form of cruel and unusual punishment (for which there is no crime) and should be used sparingly. Getting people to serve on juries is not an easy task. See Journal of the American Judicature Society (vol. 55, No. 3, Oct., 1971) and especially the article by Benjamin S. Mackoff entitled Jury Selection for the Seventies at page 104 on '' providing incentives for jury service '', in which he states '' It is the duty of those responsible for the jury system to make that experience an edifying one.''

The Pentagon Papers matter, *New York Times Co.* v. *United States* (403 U. S. 713 [1971]) has also been cited as precedent. It has little, if any, relevance, as we are here dealing with the right of a defendant during his trial to be free of prejudicial references, which may in some way be brought to the jury's attention. We are not dealing with the right of a government to maintain secrecy for by-gone documents allegedly of a confidential nature. The analogy could be apt if, *after the jury's verdict,* the transcript were to remain sealed. (Cf. *Matter of New York Post Corp.* v. *Leibowitz,* 2 N Y 2d 677 [1957].)

The petition should be dismissed without costs.

---

1. Speaking only for myself, I have in the past expressed a need for equal treatment of broadcasters who are many more in the market place of ideas and who, with the " fairness doctrine", are apt to present a balanced view of the news. (Cong. Record, 90th Cong., 1st Sess., vol. 113, Part 4, p. 4805, Feb. 28, 1967.)

TILZER, J. (concurring). While I am in agreement with much of the views expressed in the dissenting opinion by MURPHY, J., nevertheless, I feel that I am compelled to vote to dismiss the petition under constraint of *Matter of United Press Assns.* v. *Valente* (308 N. Y. 71). I am firmly convinced that although the defendant's rights are of great importance, the public also has rights which are to be considered and protected. The right of the public to know is one of utmost importance, not only to the defendant but serves to promote effectively the orderly administration of justice. The provisions for a public trial should not be defeated solely at the election of the defendant. A balancing of interest should be accorded and that is not accomplished when the public and press are completely barred from the courtroom.

In view of recent changes and progress in the law, this subject matter should be reviewed anew by the Court of Appeals.

MURPHY, J. (dissenting). I dissent and would grant the petition and annul the order of the trial court, dated November 15, 1971, which directed that the press and public be excluded from the trial of Carmine J. Persico.

This is an article 78 proceeding in the nature of prohibition. The facts giving rise to this proceeding came about during the trial of an indictment which was returned against one Carmine J. Persico charging him with the crime of extortion and conspiracy.

The indictment came to trial before Mr. Justice GEORGE POSTEL and a jury in Part 32 of the Supreme Court, New York County. During the early course of the trial the local press printed articles pertaining to the trial and also matter not testified to at the trial but rather information found through their own research and from their own files.

Counsel for the defendant moved for a mistrial based in part upon the stories appearing in the press and he later moved to continue the trial in private by the exclusion of the press and the public.

As a result of counsel's objections which were early denied, Judge POSTEL called to the attention of the members of the press present in the courtroom that their publication of facts pertaining to the reputation and history of the defendant was prejudicial to the rights of the defendant and was a violation of the fair trial free-press agreements. He suggested that further publications of this sort would be dealt with by him. The court also met with representatives of the press, of the District Attorney, and counsel for the defendant prior to issuing his warning.

Thereafter, and as a result of Judge Postel's warning, the newspapers in question, in their next editions, highlighted the Judge's admonition and indicated in the language that was in dispute, the nature of the court's and the defendant's objections.

On the next day, Judge Postel announced in open court that the warning which he had previously issued was apparently not going to be obeyed. He recited at length from the Principles and Guidelines agreed to by the members of the New York Fair Trial Free Press Conference which he suggested had not been adhered to by the press. He thereupon granted defendant's motion for the exclusion of the public and the press. The District Attorney objected to the granting of this motion.

In 1954 in *People* v. *Jelke* (308 N. Y. 56, affg. 284 App. Div. 211) a somewhat similar situation was the subject of litigation. In that case the defendant, Minot S. Jelke, was charged with compulsory prostitution and other offenses of like character. On the motion of the then Presiding Justice, Hon. Francis L. Valente, the general public and the press were excluded from the courtroom for the duration of the People's case. The defendant was permitted, however, to have present in the courtroom throughout the trial any friends or relatives he deemed necessary for the protection of his interest.

Judge Valente in announcing his ruling commented upon the " obscene and sordid details " which the District Attorney and defense counsel indicated would be adduced, and he observed that " the sound administration of justice and   \*   \*   \*   the interests of good morals " demanded that the curtain be drawn " on the offensive obscenity of this already over-publicized trial." To this ruling the defendant objected.

At the end of the People's case the courtroom doors were reopened to all. At the end of the entire case the defendant was convicted. This court reversed (284 App. Div. 211) and the Court of Appeals affirmed (308 N. Y. 56). In each appellate court the reversal of the conviction was grounded upon the exclusion of the public without the consent of the defendant and without any sanction by legislation or otherwise. In the *Matter of United Press Assns.* v. *Valente* (308 N. Y. 71, affg. 281 App. Div. 395) however, where the news media objected to their exclusion (in *People* v. *Jelke, supra*) the Supreme Court at Special Term denied a petition under article 78 of the Civil Practice Act for an order restraining Judge Valente's excluding the general public and the press from the courtroom during the presentation of the People's case. We affirmed Special Term's denial (281 App. Div. 395) as did the Court of Appeals (308 N. Y. 71).

The similarities between the *Jelke* case and the exclusion of the public and the press in the *Persico* case, which is the basis of the present application, end with the exclusion order. The Trial Judge in the *Jelke* case, in excluding the public and the press, did so in the mistaken belief that this precaution was warranted under the appropriate sections of the State law. In this he erred. In the instant case, the exclusion order was promulgated not out of the facts or the nature of the case on trial, but rather as a result of the publication by the press of reports on the defendant unrelated to the trial of the action. In this situation, I believe that the Trial Judge also erred. In the *Jelke* case the defendant objected to the court's action. In this case the court's action was the result of the request of the defendant.

The court in *United Press Assns.* v. *Valente (supra)* did not consider the applicability of the Sixth Amendment to State court proceedings. Indeed, this court in the companion case, *People* v. *Jelke* (284 App. Div. 211, affd. 308 N. Y. 56, *supra*) held that the provisions of the Sixth Amendment as construed and interpreted by the Federal courts do not apply to this State.

It is now clear that the " public trial " provision of the Sixth Amendment does apply to State criminal proceedings. (See *United States ex rel. Bennett* v. *Rundle,* 419 F. 2d 599. See, also, *Klopfer* v. *North Carolina,* 386 U. S. 213.)

In part the Sixth Amendment reads: " In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial ". I interpret this amendment as requiring the State in a criminal trial to conduct the trial in a forum open to any member of the public who wishes to attend. (*Davis* v. *United States,* 247 F. 394.) I also believe that the Sixth Amendment is fully applicable to and binding upon the States by virtue of the due process clause of the Fourteenth Amendment. (*Duncan* v. *Louisiana,* 391 U. S. 145 [1968]; *United States ex rel. Bennett* v. *Rundle,* 419 F. 2d 599 [1969].) It would appear that the objects and purposes of the Sixth Amendment are similar to those underlying section 4 of our own Judiciary Law. As was observed by the court in *United States* v. *American Radiator & Std. Sanitary Corp.* (274 F. Supp. 790, 794 [1967]) in denying defendant's application for *in camera* proceedings: " The public notice of a judicial proceeding tends to improve the quality of testimony, first, by producing in a witness' mind a disinclination to falsify, and second by securing the presence of other non-parties who may be able to furnish testimony to contradict falsifiers   *   *   * other reasons, independent of evidential service, for proceeding publicly rather than privately in the law are (1) the participants, judge, jury, and counsel, are moved to stricter conscientiousness

in the performance of their duties; (2) persons not parties to the action may be affected by pending litigation and have a right to know what is going on; and (3) public attendance has an exhaustive effect which can increase respect for law and provide confidence in judicial remedies."

The requirement imposed by the Sixth Amendment of a public trial is subject only to the narrowest of limitations and only in limited situations may the public be excluded.

It has always been recognized that any claim of practical justification for a departure from the constitutional requirement of a public trial must be tested by a standard of strict and inescapable necessity. (*United States ex rel. Bennett* v. *Rundle,* 419 F. 2d 599.)

Exceptions are such as preserving courtroom order: *United States* v. *Kobli* (172 F. 2d 919); *Orlando* v. *Follette* (384 U. S. 1008 [1965]); insuring the safety of the witnesses and parties: *New York* v. *Hagan* (24 N Y 2d 395, cert. den. 396 U. S. 886 [1969], are noted. In New York State this concept is clearly set forth in section 4 of the Judiciary Law which states as follows:

"§ 4. Sittings of courts to be public. The sittings of every court within this state shall be public, and every citizen may freely attend the same, except that in all proceedings and trials in cases for divorce, seduction, abortion, rape, assault with intent to commit rape, sodomy, bastardy or filiation, the court may, in its discretion, exclude thereupon all persons who are not directly interested therein, excepting jurors, witnesses, and officers of the court."

The trial of Persico for extortion and conspiracy does not come within the defined exclusions of the statute. Certainly the actions of the court were not predicated upon "strict and inescapable necessity" since the presence or absence of the public at the trial had nothing to do with the publication of news reports originating outside the trial relating to the defendant's past activities or associations. Nor do I believe that the defendant may waive his Sixth Amendment rights to the detriment of the public. As was stated in *Lewis* v. *Peyton* (352 F. 2d 791, 792 [1965]): "The right to a public trial is not only to protect the accused but to protect as much of the public's right to know what goes on when men's lives and liberty are at stake, for a secret trial can result in favor to, as well as unjust prosecution of, a defendant. Thus, we would be loath to hold that an accused may waive his right to a public trial."

In *Kirstowsky* v. *Superior Ct. of Sonoma County* (143 Cal. App. 2d 745, 752): "We cannot agree with respondent that the

that the waiver by a defendant of a public trial or a request by a defendant that the public be excluded from the trial is sufficient to justify the court in excluding the public."

Historically the concept of the public trial was and is to protect a defendant against a star chamber proceeding. In addition, however, the concept of the public trial insures that the public will be afforded the opportunity to observe the administration of justice. As was stated by Mr. Justice HOLMES while still a member of the Supreme Judicial Court of Massachusetts (*Cowley* v. *Pulsifer,* 137 Mass. 392, 394 [1884]) in quoting from an earlier English case: "Though the publication of such proceedings may be to the disadvantage of the particular individual concerned, yet it is of vast importance to the public that the proceedings of courts of justice should be universally known. The general advantage to the country in having these proceedings made public, more than counterbalances the inconveniences to the private persons whose conduct may be the subject of such proceedings." He further stated (p. 394): " The chief advantage to the country which we can discern, and that which we understand to be intended by the foregoing passage, is the security which publicity gives for the proper administration of justice. * * * It is desirable that the trial of causes should take place in the public eye, not because the controversies of one citizen with another are of public concern, but because it is of the highest moment that those who administer justice should always act under the sense of public responsibility, and that every citizen should be able to satisfy himself with his own eyes as to the mode in which a public duty is performed."

Sixty-five years later Mr. Justice BLACK in his opinion in *Matter of Oliver* (333 U. S. 257, 266 [1948]) seemingly made the same observation, for he stated: " Counsel have not cited and we have been unable to find a single instance of a criminal trial conducted in camera in any federal, state or municipal court during the history of this country."

The language of section 4 of the Judiciary Law set forth above is clear and unambiguous that court proceedings in the State of New York " shall be public, and every citizen may freely attend the same ".

In *People* v. *Jelke* (308 N. Y. 56, *supra* [1954]) it was held that the Trial Judge had improperly excluded the public from a portion of the trial in violation of section 4. The court stated (p. 67): " Although the trial judge was unquestionably actuated by the highest of motives, the conclusion is inescapable that his order excluding the public was not sanctioned by legislation, or otherwise authorized ".

It should be noted, however, that the court in that case did recognize the court's power to limit the number of spectators in the interest of health or to prevent overcrowding or disorder, as well as when necessary to enable an immature or emotionally disturbed witness to testify.

The right to a public trial goes far beyond the interest and protection of the accused. As was stated in the case of *United States* v. *American Radiator & Std. Sanitary Corp.* (274 F. Supp. 790, 793, *supra*): '' The argument of the defendants that they have a right to waive a public hearing and demand a private hearing reflects an absurdity equal to the interpretation that the defendants have a right to waive a speedy trial, and so convert the word ' speedy ' in the Sixth Amendment to mean ' protracted '. The Amendment reads ' speedy and public ' not ' protracted and private '. Under such circumstances as argued by the defendants all criminal charges could be defeated and chaos would result.'' Chief Justice WARREN in *Singer* v. *United States* (380 U. S. 24, 35 [1965]) noted that '' Although a defendant can, under some circumstances, waive his constitutional right to a public trial, he has no absolute right to compel a private trial.'' Projecting this further, it would seem that to permit a private trial could in effect permit a whitewash of wrongdoing by any public official of his tenure of office or of any substantial defendant who did not want his wrongdoing revealed for public scrutiny. I cannot conceive that this was ever intended.

As stated, to justify the trial court's action it is alleged the defendant has waived his right to a public trial and the court must abide his wishes. If he is correct every defendant in this State can now demand his right to a secret trial. The criminal courts could be closed forever to public scrutiny. This was never intended nor is it the philosophy of enlightened criminal procedure. Justice is the business of the public. The public is in fact party to all criminal proceedings and it is in their name that every criminal proceeding is commenced. Then obviously they must be able to enforce their right to attend — they have standing — they are aggrieved parties. If there is a right to attend a trial, and I believe it is clearly enunciated in the First, Sixth and Fourteenth Amendments and the Judiciary Law of this State, then the remedy exists.

It is true that *Matter of United Press Assns.* v. *Valente* (308 N. Y. 71, *supra*) rejected the appeal of the media substantially upon their lack of standing to bring such proceeding. In the instant case if the public and the press are foreclosed from raising this issue in this way, the issue cannot be decided on appeal, for if the defendant is convicted the granting of his motion for

exclusion of the public and the press will effectively be a waiver of that right and foreclose his right to raise this issue upon appeal. If, of course, the defendant is acquitted, then the issue will also be academic.

The issue in this case appears to me to be clearly one of denial of freedom of the press.

It is well settled that the guarantees of the First Amendment apply to a State action. (*Bantam Books* v. *Sullivan,* 372 U. S. 58 [1963]; *Joseph Burstyn, Inc.* v. *Wilson,* 343 U. S. 495 [1952].) And it is to be noted that the Court of Appeals in *Valente* (*supra,* p. 77) stated: "It is well, at the outset, to emphasize that this is not a case of free speech or freedom of the press and that the right asserted by petitioners is not embraced within the constitutional provisions guaranteeing those freedoms (U. S. Const., 1st Amendt.; N. Y. Const., art. I, § 8). The courts have ever been alert to strike down any infringement or limitation upon the fundamental right of the press fully to publish and distribute views and comments (see, e.g., *Near* v. *Minnesota,* 283 U. S. 697; *Lovell* v. *Griffin,* 303 U. S. 44; *Bridges* v. *California,* 314 U. S. 252; *Craig* v. *Harney,* 331 U. S. 367), and we certainly have no disposition or purpose to undermine or minimize it." This case concerns itself with the fundamental right of the press fully to publish and distribute news and comments.

In *People* v. *Most* (171 N. Y. 423) the defendant was convicted of permitting the willful and wrongful publication of an article which seriously endangered the public press. In affirming the conviction the court stated (p. 431): "While the right to publish is thus sanctioned and secured, the abuse of that right is excepted from the protection of the Constitution, and authority to provide for and punish such abuse is left to the legislature." And further on the court quoted from Chancellor KENT in the case of *People* v. *Croswell* (3 Johns. Cas. 336, 393): "The liberty of the press consists in the right to publish, with impunity, truth, with good motives, and for justifiable ends, whether it respects governments, magistracy or individuals." It is held: "There is no question but that the general limitations to which the freedom of speech and of the press is subject may be implemented by legislative action. Thus, freedom of speech may be limited by proper legislative exercise of the police power of the state." (9 N. Y. Jur., Constitutional Law, § 215). "Any program instituting direct control over mass media reporting of criminal cases should receive its authorization from legislative enactment rather than drawing upon any inherent power of a court." (Barist, The First Amendment and Regulation of Prejudicial Publicity — an Analysis, 36 Fordham L. Rev. 425,

451.) The restriction of First Amendment liberties must be justified by a clear and present public interest, and it is not sufficient if the threatened speech is doubtful or remote. Nothing less would warrant legislative intervention restricting this right. All attempts to punish for contempt as a result of publicity before or during trial have failed. (*Bridges* v. *California*, 314 U. S. 252; *Pennekamp* v. *Florida*, 328 U. S. 331; *Craig* v. *Harney*, 331 U. S. 367.) '' In broad terms, the message that these decisions carry is that publicity before or during trial may seriously prejudice the rights of an accused, but that these abuses ought, so far as possible, to be dealt with by some means other than summary contempt.'' (Warren, Criminal Law and its Administration: The Ditchley Papers, 66 Col. L. Rev., 31, 39). In *Bridges* v. *California* (314 U. S. 252, 263, *supra*) the court stated that '' the substantive evil must be extremely serious and the degree of imminence extremely high before utterances can be punished.'' (See, also, *Wood* v. *Georgia*, 370 U. S. 375.)

It necessarily follows that having found the present controversy concerns itself with the denial of free speech and the impairment of freedom of the press, that the petitioners as reporters, newspapers, broadcasting and television networks and services do have standing and the right to bring this proceeding.

Thus, the holding of the *Valente* case (*supra*), which rejected the applicability of the provision of the First Amendment of the United States Constitution as they applied to the facts of that case are not binding here.

A central principle guaranteed by the First Amendment is the idea of a vigorous press capable of gathering and transmitting to the public information and opinion which the people of a free society require. '' Those guarantees are not for the benefit of the press so much as for the benefit of all of us. A broadly defined freedom of the press assures the maintenance of our political system and an open society.'' (*Time, Inc.* v. *Hill*, 385 U. S. 374, 389 [1967]).

In *Griswold* v. *Connecticut* (381 U. S. 479, 482 [1964]) the Supreme Court stated: '' In other words, the State may not, consistently with the spirit of the First Amendment, control the spectrum of available knowledge. The right of freedom of speech and press includes not only the right to utter or print, but the right to distribute, the right to receive, the right to read. (*Martin* v. *City of Struthers*, 319 U. S. 141, 143.) '' Moreover, the First Amendment clearly justifies the right of the press to have access to judicial proceedings and to comment thereon. As was stated by the Supreme Court in *Craig* v. *Harney* (331 U. S. 367, 374 [1947]) : '' A trial is a public event. What trans-

pires in the court room is public property. * * * Those who see and hear what transpired can report it with impunity. There is no special perquisite of the judiciary which entitles it, as distinguished from other institutions of democratic government, to suppress, edit, or censor events which transpire in proceedings before it." Here the trial court issued a blanket order denying all access to the trial. This was unnecessary to protect any vital interest of the defendant and was plainly improper in the circumstances.

In *Sheppard* v. *Maxwell* (384 U. S. 333) a landmark case relating to press coverage and publicity at a trial, the court in reversing the conviction because of the import of press coverage and publicity, did not suggest that the press should have been excluded. Rather, the court suggested other measures, limiting the number of reporters, their location in the courtroom, the extrajudicial utterances of lawyers, witnesses and attendants, as well as sequestration of the jury.

Fair trial and free press concepts must be made to coexist. There are alternatives to achieve this end without infringement of anyone's rights.

It would be impossible to establish standards absent legislation which would warrant a court's closing the proceedings to the press and public if each Judge could establish as a standard his own objections to the comments pertaining to a case on trial before him.

It therefore remains for the Legislature to chart a new course for media to travel in the area of crime reporting, particularly as it pertains to cases in progress. Nothing short of such legislation will suffice. It is idle to speak of canons, principles or guidelines for the press, for as was said in Taylor, Crime Reporting and Publicity of Criminal Proceedings (66 Col. L. Rev., 34, 54): " The press is not an entity. It has no collective conscience for the evaluation of moral standards. It is not organized as a profession like the law, medicine, or military, from which individuals may be expelled for departure from accepted and enforced standards of conduct. To be sure, there are numerous associations of members of the press, but the press itself is an aggregate, composed of reporters, editors, and publishers, and, of course, news broadcasters and broadcasting executives, with the widest possible range of tastes and standards, and catering to very different audiences. There is a sharp competition for both news and readers. Gresham's law operates with a vengeance; the exercise of commendable restraint in refraining from a particular publication may mean only that one's nearest competitor gets a scoop.

'' Whether or not restrictions should be imposed on the press may be assumed to be a debatable question. But if such restrictions are deemed desirable, then, in my view, they cannot be accomplished by voluntary ' codes ' or self-regulation in any other voluntary form. Sanctions of some sort are needed to enforce whatever restrictions are thought necessary.'' Attorneys' conduct pertaining to such matters is already proscribed by appropriate canons, and police and other officials can be similarly prohibited from communicating information bearing upon the guilt or innocence or character of an accused and violations may be punished as contempt.

It is obvious that the exclusion of the press and the public, in this case was a futile act since the publications complained of were not those that unfairly, improperly or inaccurately recorded the happenings at the trial, but rather those that commented upon the character and background of the defendant. Such conduct can continue unabated in the present posture of this case. Neither has it been shown that any clear and present danger exists that this defendant will receive other than a fair trial.

Accordingly, and for the foregoing reasons, I find the order of November 15, 1971 was unlawful and arbitrary.

MARKEWICH, J. P., and STEUER, J., concur with KUPFERMAN, J.; TILZER, J., concurs in an opinion; MURPHY, J., dissents in an opinion.

Cross motion of Louis J. Lefkowitz, Attorney-General of the State of New York, granted, the application denied and the petition dismissed without costs and without disbursements.